Our third case for this morning is Philos Technologies v. Philos & D. And as counsel make this argument, the more clarity you can give to which party is doing what when would be appreciated, at least by me. So, Mr. Peel. Mr. Peel. Thank you, Judge Wood. May it please the Court. I represent the plaintiff appellant in this case, Philos Technologies, Inc., an Illinois company that for ease of reference I'll hereafter refer to simply as plaintiff. All right. Free rulings are before the Court today for argument. I don't have time to address each of them in detail, but I would like to make a point or two about each. And as with our briefs, I will begin in reverse chronological order. Most recently, we filed a Rule 60b-3, 60b-6, and 60d-3 motion in front of the District Court because the parks, defendants in this case, party opponents, had been convicted of perjury in Korea by the Korean courts beyond a reasonable doubt. That perjury was not peripheral to our case. That perjury was on all fours with the declarations that the parks submitted to the District Court below and that the District Court expressly credited in its earlier. Well, why don't you tell us what your main point is, right, instead of going off into these tangents. So here's, I mean, just at least the main point as I see it is how there possibly could have been personal jurisdiction in Illinois, even taking the facts as you are arguing one might be able to take them. I'm having a great deal of trouble seeing the necessary links to Illinois, whether this was a phone meeting or whatever. This strikes me as a Korean transaction. Whether what you did was sanctionable or not, I consider a different question. And so for me, it would be helpful if you addressed those two things. One, personal jurisdiction. Two, why this either was or was not an abuse of discretion to impose the sanctions. Sure. As to personal jurisdiction, we think Bally Export decision from this court is the guide and establishes that it's appropriate in a case like this one to find that a defendant asserting a 60-B-4 motion has not met the burden of proving jurisdiction does not exist in this district. But what are the Illinois links? I mean, I understand it's a 60-B-4, whether it's a 12-B-2, a 60-B-4. The links are thin at best. Give me your best case. Your Honor, I would submit that they're more substantial than the links found adequate in Bally Export and for this reason. Well, but the Supreme Court's been busy in this area too lately, so let's pretend that that's all we have. Yes, Your Honor. First, there was a call placed to Illinois on December 20, 2007 by one of the parks to form the joint venture. Right, but that's a phone call. So why is that purposefully availing yourself of the benefits and protections of Illinois law? Because somebody in Korea phones you and you pick up the phone and have a business conversation? No, because the specific intent of that call was to form a joint venture with an Illinois company because it was that type of company which could confer special benefits under Korean law for foreign direct investment. No, I understand how that works, but it was a Korean joint venture, right? P&D is a Korean joint venture. It is a Korean company, yes, Your Honor. Organized under Korean law, operating in Korea with, as it happens, a foreign partner, allegedly Phelos Technologies. Yes, Your Honor. I'm merely proceeding in chronological order here in terms of the context. So that's what we would say. So the phone call is one. The phone call is one. There's a follow-up email that occurs on December 28, 2007 to Phelos' email address referencing the type of incorporation of a foreign direct investment company, and that's in the record as well. In addition, in May of 2008, Defendant Don Heapark makes a visit to Phelos & D's factory in Wheeling, Illinois. The parties sit down and agree upon the price for the final equipment and the composition of that equipment. They finalize the terms of their deal, if you will, on Illinois soil. An invoice is hand-delivered at that point to Don Heapark in Illinois soil, and then the next day, Don Heapark goes with the Coes to a radio broadcast to Chicago Korean speakers to advertise and promote the business venture that's being established here. Is there any transcript or anything? I mean, I saw your allusion to this radio program, but do we have further evidence other than his statement of it? Yes, Your Honor, there's a transcript from a translator that's part of the record in this case, and in my rebuttal time, I'll be happy to point Your Honor to the place in the appendix where that transcript can be found. Okay, good. So, yes, there was a May 2 appearance on a radio program in which they were promoting the very knives that were to be generated by this joint venture to Illinois consumers, making note of the fact that a prototype had already been provided to one sushi restaurant in Morton Grove and extolling the benefits of bringing this technology to Korea that would then be the basis for an export business, which would include sales into Illinois to Illinois consumers. So your opponents argue, though, that actually there's this other company, this PLST company. This is all the same family. I mean, the whole thing seems so crazy to me, but the PLST company that just sends money to Phelos Technologies, which then sends the money back to the joint venture, they call it round-tripping, to make it look to the Korean authorities as though there was foreign direct investment coming into the country, whereas, in fact, there isn't. Your Honor, they make an assertion that the joint venture with our company is, in fact, a sham, but we think that that's an unfair characterization of that transaction and not in keeping with the burden of proof that the defendants bore in this case to prove that by preponderance of the evidence that it was, in fact, a sham. There's no evidence under Korean law there's anything improper about establishing a business in that fashion. And, in fact, in defense of the sanctions ruling, we put forward a declaration from the very Korean official allegedly scammed by this joint venture saying they didn't care about the wiring of funds to establish this company. It was simply done as a convenience, and there are other references in contemporaneous documents in the record that were authored by the Parks themselves saying it was done as a convenience because to do an investment in kind to form the corporation was much more complicated under Korean law. Is the idea that maybe the money does make this round trip to create the company, but then they're expecting some stream of further investment in kind or goods coming or something? Precisely, Your Honor. The testimony is the money is, in fact, returned to the Parks, and following that there is the investment, the capital investment of the equipment, the million dollars worth of equipment shipped from the Illinois company into Korea. I want to address briefly, Your Honor, the sanctions point as well because I think that was one of your questions also. It was certainly one of my questions. And here we submit that having had no fewer than five Korean courts of competent jurisdiction decide that, yes, in fact, the joint venture existed between the plaintiff and the Parks, and that, yes, in fact, the plaintiff had an agreement to supply equipment to that joint venture, it was certainly reasonable for the plaintiff here to continue to assert that position after the defendants served their Rule 11 letter in November of 2011. Three of those decisions at least had predated that November 2011 decision, and there were two decisions subsequent to that November 2011 letter, which, again, reaffirmed that the joint venture was, in fact, changed and was, in fact, between plaintiff and the Parks and that the plaintiff had the agreement to supply the equipment to that joint venture. Right. So the district court finds it very difficult to swallow that in December of 2007, practically on the same day, a joint venture is created with PLST and then it gets superseded by a joint venture with plaintiff. Maybe you could comment about that. I can, Your Honor. It's true that these things happen on the same day, but an explanation is offered for that in the record, which is this was the idea of the Parks in order to gain competitive advantages by having a foreign investor. Moreover, that's borne out by contemporaneous documents that come after December 20, 2007. And so the error in what the court did here, the clear error, was the overriding legal significance it attributed to these written agreements from December 20, 2007, when, in fact, those agreements were signed by Phylos & D when it wasn't even incorporated by a person who wasn't even the CEO of Phylos & D. And these agreements, as the record goes on to show in the later motion practice, were not worth the paper they were written on. So PLST has the wife as the CEO, and is it your company that has the son, Sam? Yes, Your Honor. Okay, and then above all of this is the father, right? Phylos Co. is the chairman of both Plaintiff as well as the Korean company. Yes, Your Honor. So I'm also trying to figure out whether the close relationship of all of these parties, and therefore perhaps their businesses at a practical matter, either adds or subtracts to the plausibility that maybe the arrangements made in December 2007 were more fluid than they ordinarily would be if they were arm's length. It adds to the plausibility of the plaintiff's account here for that reason and for the reason that there was a longstanding personal relationship between the president of Plaintiff and Don Heapark. They had formed a relationship in Vanderbilt from 2001, carried that relationship forward, had been discussing a potential business arrangement for several months. It was, as you say, closely held family companies with the father being the chairman of both companies. And so, yes, that is another important circumstantial piece of evidence that the trial court unfortunately simply ignored. The parks are citizens of Korea, right, Don Heapark and Jaehee Park? Yes, they are, Your Honor. And residents there? Yes, they are, Your Honor. The parks are residents of Korea. With respect to the trial court's Rule 60 ruling, which I'd like to just briefly conclude on before I run into my rebuttal time here, Peacock Records from this court makes clear that when perjury has been used to procure in part a judgment, the trial court shouldn't go back and try to re-weigh that evidence. Unfortunately, that's what the district court precisely did here and it's in the transcript that's set forth here reflecting its decision. There's no effort to defend that stated rationale for the trial court's decision here because it's indefensible. One cannot simply go back and unscramble the egg, and indeed here the contemporaneous findings of fact and conclusions of law from the district court reflect that it credited and expressly relied on the declarations from the parks in the very respects in which they were perjuries. Well, and the trial court also made credibility determinations about Sam Coe, right? It did, Your Honor, but those were not... Believe anything he said, more or less. Well, that's not quite accurate, Your Honor. It credited the things that he said that fit with the district court's view of the world and it disregarded the other things and found the other things to be false. But it is true, but the district court's credibility determination is not independent of the declarations of the parks. One cannot be certain, in other words, that Judge Schader would have found the same credibility issues absent those declarations that he found with them, particularly given his citation and expressed reference of them in his findings of fact and conclusions of law when he's talking about the credibility challenges here. Just a final point as to the personal jurisdiction rulings of the district court here. The biggest problem with all of this is the substance and the merits of the business transactions at issue here should never have been the subject of a Rule 60b-4 hearing. That hearing was supposed to be addressed to the jurisdictional context, not whether the contract was between Party A and Party B or Party A and Party C or other merits issues. Valley Export, among other cases, says it's simply too late in the process to raise such a substantive defense. It took us by surprise, for sure, that we were now having to defend the legitimacy of the joint venture that had been established. There are all kinds of contemporaneous documents that evidence that. The trial court's attempt to shove all that under the rug simply by referring to that as evidence of a sham when none of those documents independently verify that, again is an example of the trial court fitting the facts to reach the result it wants and not the facts themselves supporting it. That's the kind of clear error on a record that Lindquist-Ford says should not occur. Thank you, Your Honor. All right, thank you. Mr. Moss. Thank you, Your Honor. May it please the Court, I'm John Moss. I represent the defendants in this case. And I think that the main theme with respect to the Parks position taking off on the questioning of the Court and Mr. Peel's argument is that Judge Schrader is due deference and that with respect to the facts that he found, there is substantial record evidence that Phelos, Illinois, the plaintiff, intentionally filed a fraudulent complaint in an effort to trigger U.S. jurisdiction over a strictly Korean-based dispute. I am somewhat concerned about the last point that Mr. Peel made, which is the question whether the personal jurisdiction issue got too snarled up in the underlying merits. I could well imagine if this had been litigated in a more straightforward way, and in some ways it's nobody's fault that it wasn't. I understand how it came about. The personal jurisdiction contacts, as I said, strike me as quite thin. It seems to me if it had been properly litigated, somebody might have also filed a motion to dismiss on form nonconvenience grounds since it's such a Korean-based transaction. I strongly doubt it would have been an abuse of discretion to have said, you know, whether things are right or wrong, we're just going to bow out and let the Korean courts sort all of this out. And so maybe this belonged in Korea. I have a hard time seeing $800,000 worth of sanctions being appropriate given what the Korean courts have been saying and the district courts. No one is saying the district court is bound by it, but it's a matter of international comity, which is less than being bound. One thinks you ought to look at what other courts involved in the transactions have said, and I don't think the district judge did. With respect to the last point, Judge Shader, in fact, did make comments during the course of the evidentiary proceedings regarding the foreign. They were quite derogatory comments. Well, I don't think they were derogatory at all. I think that what he said specifically was that they were opaque to him, that he wasn't aware of the nature and extent of how they reached the findings that they reached, and that he didn't believe that in the circumstances with the witnesses that were available here in Illinois who had the primary source of evidence with respect to what Velostek's role, the plaintiff's role was here, that he should defer, and I think at that time as well. But, you know, his information is imperfect. He can't even figure out if that whatever it was, August letter, refers to canceling one or two agreements. And I certainly don't speak Korean. You know, I'm told that it's an alphabetic language, and so it's easy, they tell me. But if you don't speak Korean, you're not going to do too well reading any of the relevant original documents. I think that obviously his concerns with respect to it being a foreign proceeding and some opaqueness with respect to those proceedings is why he relied largely on the evidence that was presented to him in his court. But that's going to be true any time you have a foreign court proceeding. You're not going to be as familiar with the procedures that court uses, with its fact-finding tools, with the evidence that comes before it. They create records in different ways from the way we create records. There's a lot that's different. So that's why it's kind of the bottom line of what the court has done that we need to look at, take or leave, of course. Sure. Ultimately. With respect to those issues, I think it would also be fair to comment, as Judge Schrader commented in the record, that those proceedings in Korea weren't being primarily undertaken to determine the same issues, and that I think with respect to his view and what the evidence showed, to the extent that there was what was characterized as a sham transaction meant to deceive Korean authorities, it would be quite unlikely that the parties in Korea, until that sham transaction came to light here in the United States proceedings, would be talking to the Korean courts about the sham transaction. Judge Schrader understands foreign direct investment laws. I don't think that foreign direct investment laws were at issue with respect to what he was asked to decide. They are totally at issue as to whether this is a sham transaction, because the United States has a network of treaties all over the world that govern foreign direct investment, and when the recipient country, here Korea, decides that it wants foreign investment, there are often both requirements and benefits, sometimes tax benefits. There are a lot of things. This is a complicated area of the law, and I'm not sure looking at just the facts he looked at, he even had enough information to say it was a sham. Well, the record evidence, if I may, addressed exactly what he relied upon to say it was a sham, was that with respect to what we characterize as the round-tripping of funds, let's start with that. But that doesn't tell you anything about the flow of equipment, goods, services, intellectual property over time somebody might hope for. Sure. But we understand with respect to the original characterization of this entity being one that would seek a foreign direct investment credit in Korea, that the funds didn't originate from a foreign source. They originated in Korea, were sent to PLS Tech Korea, from PLS Tech Korea to Illinois, and then back to Korea. That's not a foreign investment. The next thing that Judge Shader relied upon and that there's no dispute about. No, that isn't, but I guess the Korean official was saying we don't really care what the seed money was. The local business official that they asked for an affidavit after the fact in order to help another local businessman, after these factual determinations were made, after the original evidentiary hearing, decided to say something that would favor the local Korean businessman. I don't think that that's a determinative. Is he a local businessman or is he an official? What's his role? I don't think he's someone that speaks with legal authority for Korea or its taxing authorities. But I'll defer to Mr. Peel's record citation and characterization. But those documents are in the record for the court's review. But what I wanted to say with respect to the other aspects of the sham transaction, and the timing here is important, that in December of 2007 we have the only written agreements that attempt to characterize the relationship between the parties. Wasn't there, though, a joint venture agreement later on that shows Phelos Technologies as the partner? I wouldn't characterize it as a joint venture agreement. The only joint venture agreement that actually talks about the various roles and responsibilities of the entities involved is between the Korean company and my clients, the Parks and Phelos and Dean. No, tell me what I'm thinking of then, because I thought that... I think you're referring to articles of incorporation. And let me just put that in context. So these written agreements are signed in December of 2007. And then in February of 2008, many things happened that are directly relevant to the findings that this was a sham transaction. Number one, in February of 2008, these articles of incorporation are identified. Number two... The articles of incorporation, though, have Phelos Technologies, the Illinois company. So you can't say that the only writing shows PLST, because there's the articles of incorporation, which are not... And Judge Shader looked at those, and he said that with respect to those, they don't actually talk about the roles and responsibilities, the shares and capital contributions of the companies. There's nothing in them that specifically contradicts the underlying original agreements from December 2007, which he found, because they were signed and they were the only agreements that, in detail, talk about the nature of the relationship that were credited. But in December, when those documents were prepared, that's exactly when the round-shipping of funds occurred. It's exactly when the Korean company started to actually manufacture, effectively, as Sam co-admitted, every component of the equipment and then send it to Illinois to be shipped back to Korea. Now, I saw one part of Judge Shader's opinion that worried me about that. It looked to me, although please correct me if I'm wrong, that it was unclear whether literally all of the components were simply manufactured in Korea, sent to Illinois as components, and then sent back again to Korea still as components, to be then assembled, or, alternatively, whether components were manufactured in Korea, sent to the United States where some transformation occurred, perhaps some assembly, and then sent back to Korea for further things. And Judge Shader, as I recall, said, I don't have to decide which of those scenarios it is. But I think that may not be true, because if there was assembly in Illinois, then it would suddenly look a lot like what Toyota does with its automobiles, or it would look a lot like a great number of international transactions. Well, I think what the record reflected was that there was a dispute with respect to that. He said, why don't we need to resolve that dispute? Why isn't it relevant to the sham issue? Well, he decided it based upon Sam Coe's testimony during the hearing. He didn't resolve it, though. He said, I don't have to resolve this. Well, I believe that because he ultimately determined that this was not a conversion case and rather a contract case, that he concluded that the place of manufacture was not important to the ultimate legal determination of jurisdiction. Well, but it is important, surely, on the question whether this was a sham transaction that should lead to sanctions. Well, I don't – the record evidence before Judge Shader, Sam Coe testified about what actually happened at his alleged manufacturing facility. Sam Coe testified that he had no manufacturing records because they had all been lost in a flood. Sam Coe had some pictures, but to the extent that they tried to characterize what's going on – Well, are you saying the judge could not have found that there was any assembly in the United States? No. I'm not saying that he could not have found that there were – Well, apparently he didn't make a finding. He concluded, I think, that in his statement in the ultimate opinion, that he felt that they had the better side of that, that it was more plausible, is what I believe he said in the record, that in fact all the complements were semi-manufactured, put together in Korea, sent here. Some additional manufacturing was done. Records unclear as to what. The materials from Korea that were sent also included just simple processing chemicals and other pieces of equipment that required no further – So what is it that Judge Shader said he didn't have to decide? He concluded that because ultimately the case sounded in contract under the facts as were presented to him, that there was no need to determine the place of manufacture because the standard for personal jurisdiction in that context was not one about whether the parks purposely availed themselves of the right to do business in Illinois. It was about the contract framework, I should say. So just to be concrete, I'm looking at paragraph 22. This is the 925.12 ruling. In paragraph 22, Judge Shader writes, as to what happened after those components were purchased, that is to say the components from PLST, the Korean company. The positions advanced by the litigants are polar opposites. One side says everything happens in Korea. It's shipped to the U.S. company and then it's just shipped back to Korea in kind of a sham transaction. Conversely, Phelos Tech, that's the Illinois company, asserts that the South Korean originating components were assembled here in Illinois and that the completed equipment was then shipped back to Korea. He says, well, he can't evaluate Nam's credibility because he speaks Korean. On balance, though, Phelos Tech's version, buttressed by photos and bills of lading, appears more plausible. And then paragraph 23 begins, it is unnecessary, however, to resolve that conflict. Blah, blah, blah. And he goes on for other things. So that's precisely the part that I'm trying to focus on. Right, right. I think I answered your question with respect to that. Well, why wouldn't, if there was a substantial assembly of manufacturing in the United States, wouldn't that undermine the conclusion that this was a sham transaction, which the only purpose was somehow to pretend that these Korean companies were active in the United States? I think the framework that Judge Shader adopted, which is the one that evidence supported, is that written agreements that... Why don't you answer my question? I am, Your Honor. I may be very specific. Why don't you answer it and not make a speech? The question that you posed asks whether the place of manufacture, and if there's substantial manufacture in Illinois, would be important to Judge Shader's determination. The answer is no. Would it be relevant? Under his view of the contracts, no. I don't get that. Can I explain? Sure. He concluded that the equipment agreement, the agreement about actually obtaining the equipment, was with PLS Tech Korea. PLS Tech Korea could have gone to Australia, they could have gone to Illinois, they could have gone to Mexico to have that equipment manufactured and provided back to my client in Korea. There was no direct contract between my client and plaintiffs about how and when to get that equipment. Our contract was with the Korean entity, and Judge Shader concluded that if there was any manufacture that occurred in Illinois, it was done pursuant to the father's direction to have the son participate in this transaction and then send the equipment back to Korea. But that was a decision as between the Korean father and the Korean son. Not an agreement that our clients demanded or in any way had direction over. Now, how did Judge Shader arrive? What is 800,000 or 880? Is this some kind of fine? Is that what it's supposed to be? This case has been pending now. Is it a loss that your client sustained? Legal fees. This case has been pending now. It's legal fees. It's 100% legal fees. The case has been pending, unfortunately, for almost six years in the United States District Courts. So the 800,000 is all legal fees? Unfortunately, it's not all legal fees. It doesn't include the fees for the prior... Is that just legal fees? Yes. Like I say, this case has been litigated now for almost seven years in the U.S., which never should have seen our shores. And it's been up to the Seventh Circuit once before. It's the second trip here. And it's been a very, very difficult case between the parties given the conflicting facts. And this is punishment for what precisely? For what the court held? For fraud. Despite, as Judge Wood pointed out, the vast majority of the iceberg here being set in Korea and the fact that right now there's probably 15 different suits and judgments that are going on and still active in Korea, solely to obtain litigation advantage. Well, that happens all the time, I'm going to say. I mean, you know, Piper Aircraft against Randolph. There are all kinds of cases where people give it a shot. You know, they think there are enough contacts to survive international shoe and so on, so they sue, and they lose on personal jurisdiction. But in the overwhelming majority of these cases, the loss is not accompanied by sanctions. You just lose. That's enough of a sanction. May I respond briefly? Please. I think some of the key evidence with respect to the sanctions would be found if you look at Sam Coe's affidavit in response to our original motion for sanctions, where plaintiff's counsel asked Sam Coe, the plaintiff's principal, to file an affidavit. And in that affidavit, Sam Coe told the court that he never told his Illinois lawyers about the written agreements in Korea that actually identified the Korean entity as the principal contracting party. He never told them about this round-tripping of funds. He never told them about the mediation he participated in, where a lot of these allegations about the scam transaction came up in 2010. And the lawyers, in trying to avoid sanctions, did everything possible that they could to put distance between those facts and themselves, recognizing the damning nature of that evidence. And, you know, I think Judge Schrader appreciated the damning nature of that evidence and concluded, after assessing the credibility of Mr. Coe, that this was a purposefully false complaint filed without substantial basis. Is that all the fees? No. There are substantial fees related to Korean litigation. What are they? Related to the prior appeal. We're not appealing that aspect of the ruling. The Cooter and Jowell is a case from the Supreme Court. Wait, no, no, you're going too fast. What are the fees that are the basis for the sanctions? What are they for? Under the relevant framework for sanctions and fees, which the court applied, the Seventh Circuit precedent, if you file a false complaint, everything that follows is ultimately a recoverable fee. And there's no need to parse with respect to what fees are related to a particular plea. Look, I'm asking a simple question. What are those fees? Are they all your fees? They're all of our fees. Cut-off date or what? They're all of our fees, with the exception of any fees that would have been related to the appellate matters. I think that's a fair characterization. Which you're going to ask for, I'm sure. No, I can't. I think the law does not allow us to ask for those. Pardon? The law, the Supreme Court, does not allow us to seek those fees. And my clients have incurred as well substantial fees in Korea outside of this jurisdiction, which obviously we're not seeking. They've not been awarded. Anything else? If there's no further questions, I thank you, Your Honors, and would ask that you affirm Judge Shader's judgment. All right, thank you very much. Anything further, Mr. Peel? Just a few brief points, Your Honor. And actually, I would like you to address the Sam Coe affidavit that Mr. Moss was just talking about. Yes. I'll start there, Your Honor. That affidavit was submitted in opposition to the sanctions ruling, and there was a subsequent affidavit which addressed other issues. Just because Sam Coe didn't consider the December 20, 2007 agreements to be relevant, based on his understanding of the transactions as a layperson, doesn't establish that he was defrauding anyone by not mentioning those to his attorneys, or by not making them aware of the funding that was used to establish it. He was told by the Parks, the record is clear, the Parks consultant said, wiring funds in this fashion is an okay way to establish the company. The follow-on in-kind capital contribution then will be a satisfactory way to show the foreign investment. There's nothing a problem with this. So, he was under the understanding at the time that none of this had anything to do with anything. So why would he share it with his attorneys? Certainly, it wasn't anything identified by Judge Shader as a basis for sanctioning Phelos Technologies. With respect to the record items you had asked about, the radio show volume one of the separate appendix pages 198 to 213. Moreover, the declaration from the Korean official, it is an official from the city of Gwangju. It is not a private individual. He was directly involved in negotiating the memorandum of understanding that was worked out. That can be found on pages 519 to 24, which is volume three of the stand-alone appendix. Your Honor had asked a question to Mr. Moss about a forum non-convenience argument and maybe that might have some merit in a case like this one. Recall, however, that we're in a procedural posture post-judgment. This is not where they deliberately chose not to appear and contest jurisdiction or seek a motion to dismiss forum non-convenience or things like that. So, they were limited in what they could do here. In fact, they did make a Rule 60b-6 argument, a throwaway argument, that it should be dismissed on forum non-convenience grounds but they never pursued that argument. So, I would argue that it's been waived, Your Honor, if that's something that this Court's interested in. With respect, briefly, to some of the other points raised, I think critically important here, as Your Honor has addressed, is Judge Schader was making determinations about what constitutes a foreign direct investment company under Korean law without any adequate record to support that. Here, the burden was squarely on the defendants because they chose not to contest this until a post-judgment proceeding. Bally Export makes that clear and that's been the law in this jurisdiction for years. So, it was their burden to prove up what Korean law. None of that was before the District Court. In fact, Rule 44.1 of the Federal Rules of Civil Procedure further says it's their obligation to bring foreign law issues to the attention of the Court and decisions with respect to those things are matters of law by the Court. When you decided to sue in the United States, could you have brought similar suit in Korea? It's my understanding yes, Your Honor, one could sue in Korea. That, of course, doesn't prove that it's as Judge Wood has said, but yes, it could have been brought in Korea. I was just wondering what whether um whether the other side would have incurred similar legal expenses in Korea. Well, Your Honor, the record does reflect that they incurred, I believe, $150,000 or so of expenses in fighting confirmation of the default judgment. There was a proceeding in Korea that resulted in a judgment of the Korean Court in September 2010 in which it found enforceable and valid the default judgment that had been entered by the District Court in July of 2009 and they claimed they sustained $150,000 or so of expenses in that legal proceeding alone. So it's quite possible their expenses there would have been equivalent or certainly substantial. I see that my time has expired, but I'd be delighted to answer any further questions the panel has. Apparently none. Thank you very much. Thank you, Your Honor. Thank you to both sides. We'll take the case under discussion.